Hello, thank you everybody for convening remotely today. This is Judge Menasche. I'm joined on the phone by my colleagues, Judges Sack and Wesley. We have four cases on the calendar today, one of which will be taken on submission. That is 1942-85, the Jar Group LLC versus West 56 Hotel LLC. And so we'll proceed to the argued cases for today. The first one is number 1943-49, Pennington versus D'Ippolito. Mr. McHugh. Yes, good morning, your honor. May it please the court. My name is Patrick McHugh and with me as co-counsel on the brief is Patrick A. Klingman. Mr. Klingman and I represent the plaintiff appellant, Dale Pennington. At issue on this appeal are three counts of a civil complaint as to which Judge Seibel of the district court granted summary judgment against plaintiff. All other counts of the complaint are not at issue. Those that are, professional negligence, specifically accounting malpractice, which is count one, and two aiding and abetting counts, count six and eight, one for fraud and the second for unfair trade practice. As to count one, Mr. Pennington was the 25% equity holder in Seisman, a Connecticut limited liability company. The 75% balance of equity was held by an individual by the name of Kurt Wittig. Can I just interrupt early and ask you whatever happened to Mr. Wittig? Where is he? He does what very good rich people do when found to be wrong, Judge. Yes, tell me. He's ghosted. We're still searching for him and for assets and have not been able to do so. Thank you. With the court's permission, should I proceed, Your Honor? Oh, absolutely. That was my interruption. Go ahead. I'm sure. I point out the following as to why the court committed reversible error as to count one for Mr. Pennington, a duty to exercise care in their review of Seisman's financial records. The district court acknowledged this duty and properly found that defendants breached that duty for purposes of the issue going to trial. However, the court below framed defendants' liability as derivative. Quote, the accountant is alleged to have failed to notice an issue caused by someone other than the Here, Pennington alleges that the harm suffered was caused by defendants. While Wittig's pledge of Seisman's sole asset was unquestionably a factor, it was not the substantial cause for the claim of accounting malpractice. The evidentiary record demonstrates that defendants saw the loan proceeds pass into and out of the Seisman bank account, seemingly having no idea where they came from, although they clearly should have known that Seisman was the borrower. There was no other way the funds could be deposited into the Seisman account. Yet defendants communicated nothing to Mr. Pennington, not when the funds were first drawn by Seisman, not when the quarterly report issued in late September of 2007, not ever. Mr. McCue, this is Judge Wesley. Is it your position that the accountant's responsibility was to report at the time of the occurrence of the transfer, the time that the funds initially came in and out, in July of 2007? Absolutely, Your Honor. And that's steeped in the record with respect to the joint appendix testimony of Dale Pennington, which places the accountant literally rendering, making entries into the books and records of the company. You also submitted an expert affidavit, didn't you? And the expert clearly indicates that there was a deviation from the standard of practice of an accountant in the area in which Mr. Diabolito was practicing, at least with regard to a listing the transfers in and out of the company in the third quarter and subsequent drawdowns and or the ultimate encumbrance of one of the assets of a limited liability corporation, correct? That is correct. Judge Seibel also noted that. And although there's a panoply and a listing, it really comes down to one simple thing. If money is coming into Seisman as a borrower, it needed to be booked as a loan. That's indeed what it was for Mr. Wittig, and that never happened. I understand that. So let me ask you this. Where in the record did you, and so your position is that at least by October, when the credit loan agreement ultimately was executed, there should have been some notice to you, to your client, and no later than January, he should have been aware of the fact that, A, the assets of the limited liability company had been encumbered without his knowledge, and second of all, that he had in essence monetized the equity of that asset and withdrawn it to his own use, Mr. Wittig had, correct? That is correct. And to supplement further what your Honor's observation is, which is very much on point, it's not just Seisman's asset that was pledged. There were other LLCs that were pledged. So we had a credit facility of nearly $10 million, but Seisman is the only borrower. So therein lies the funds that should have and were available in order for Mr. Pennington to preserve and not suffer a loss of his investment. Now, let me ask you this. In front of the arbitrator, the question of liability was merely whether Mr. Wittig had breached a fiduciary duty owed to your client, correct? Correct. Different issues. Right. Okay. But in front of Judge Seibel, not only was it a question of a breach of a standard practice, but wasn't it also a question of whether you could then collect, how you would be able to collect following that breach? And what in your papers indicated that there was some avenue on which you'd be able to recover at that point in time? An excellent question, Your Honor. And this could be found in the Joint Appendix with the excerpts of the deposition testimony of Dale Pennington. A year before the loan, Mr. Pennington is a sophisticated businessman. He runs his own business. A year before the loan, in 2006, he did consulting work on-site, and he saw the accountants on-site at Mr. Wittig's facility doing books and records and so on and so forth. He was not pleased because he found discrepancies in 06, and he distinctly had conversations directly with Mr. DiPolito, one of the named defendants. There was a short of about $50,000 in a capital account. It was in 06. So I'm sorry. So that evidence shows that Mr. Pennington was sort of a watchdog over the accounts, but it doesn't show that he would have been able to recover the losses if he had been alerted by the accountants, does it? Well, having – I would disagree with Your Honor as follows, along the following lines. Mr. Pennington is just – leaving detail aside, he's a watchdog. He already caught them before the loan, and he wanted quarterly reports. Now, the duty was before September, but certainly as of September when he got the quarterly report, he should have been told. That doesn't answer either my question or Judge Menache's question. Our question is this. Given the fact that he knew or should have known or been told by September 30, 2007, what is it specifically that he could have done? Because you've now told us that there are other LLCs that are encumbered. There's not a lot of information about the nature of the loan, what was encumbered, what wasn't encumbered. What was it – just the simple fact that there might have been some money left in the loan doesn't necessarily mean that your client would have gotten it. I need to know, where in the record did you tell the court or show the court that there was something that if he had known it in September of 2007, he could have actually gotten his $513,000 out of the LLC? In response, Your Honor, the money is there if he's made aware that there is a rogue loan that still has money and his investment is the borrower. As an equity holder, he had the ability to be made whole. That's your position, that as an equity holder on that LLC, that was enough for him to establish that there was a causal link between the account malpractice and his injury, right? That's correct. Does the record show that he was entitled to cash out his capital account balance immediately? I can't speak to the operating agreement. I'm comfortable representing that the answer is no, that he couldn't just say, hey, I want out. That's not the situation, Your Honor. The situation we're dealing with is we have a rogue loan that is literally bankrupting Mr. Pennington's investment. I understand, but causation was an issue before the district court. So I guess maybe apart from whether he was able to pull out the money, when the accountant moved for a summary judgment, did you explain to the district court in opposition to summary judgment that this is what Mr. Pennington would have done had he been alerted to the loan? I did, Your Honor. Where is that? It's incumbent for me to say that what I shared with the court as to proximate cause, which was discussed, the court found it lacking. Okay. Well, I have your memo in opposition to summary judgment. So you're saying that there was some separate communication with the court, or is it within that memorandum? No, no, no, no. It's within the judge's memorandum. Right. So it's the statement on page 15 of the opposition that says there's ample evidence in the record to demonstrate Mr. Pennington suffered monetary harm proximately caused by the calculated acts and omissions, active concealment of Mr. DiPolito. Is that right? That's correct. Okay. All right. Well, you've reserved time for rebuttal, so we're going to hear from you again. Let's turn to the appellee, Mr. Creighton. Thank you, Your Honor. May it please the court. My name is James Creighton of the firm Dorca Nelson, formerly Steinberg & Cavalier. And I think Your Honor, in your question, I understand the point exactly. Simply put, Pennington's damages result not from anything that Mr. DiPolito or the firm did or didn't do, but rather from the uncontested fact that Mr. Wittig improperly pledged and lost its whole asset that Seisman had. Pennington was not aware of those events when it happened, but neither was Mr. DiPolito. And we didn't get into the aiding and abetting claims, but I think they also failed. But I think Your Honor's focus on proximate cause is extremely crucial here. That is the primary issue on this appeal. Yet, candidly, Pennington essentially ignored this issue in the district court. And for that reason, that reason alone, this appeal should fail. While they spend about 80% of the legal arguments in their briefs on this, the appeal is too late for those arguments. They waive those arguments by not making them below, and the court really should be ignoring those arguments on appeal at this point. But if you don't, there really is no issue of fact here. The damage was done when Mr. Wittig stripped Seisman of its whole asset, unbeknownst to either Pennington or the DiPolito firm. The court certainly looked at that and established and understood that plaintiff was not able to establish proximate cause. The district court found that Pennington didn't satisfy any of the alternatives that were required to be found for proximate cause. It didn't show that there was an affirmative reliance on statements that were prepared by DiPolito, nor did they show that they would have been able to mitigate damages. The ghosting of Mr. Wittig certainly says a lot. Why can't we just look at the record and see that it's reasonable to infer that Mr. Pennington could have redeemed his capital account? I believe that while that would lead to speculation on some level, I believe it also shows that it's inaccurate. As of September of 2007, nearly $5 million had already been drawn down under the Cherry loan. At that time, the balance of an already existing mortgage on the lien owed by the company was about $4 million and probably more. That says nothing for the re-pledging in 2007 of up to $9.4 million. So the company's mortgage debt was at least $3.2 million. So your position seems to be that if the company had sufficient assets, we would have been able to take the money out, but the record just doesn't establish that there was enough equity to do that. Is that right? Your Honor, I wouldn't concede that it would have, but I think that the record clearly shows that you can't rely on that, that there simply is no basis for that in the record. There certainly is an issue of collectability that the record makes entirely clear. What about the Cherry loan itself, which belonged to the company? Why couldn't he make an effort to collect from that? The Cherry loan that had been drawn down, I believe as of September of 2007, was $5 million of a drawdown at that point. So I'm not sure how much more other than the... Your Honor, I'm not entirely sure about the numbers that were available, but certainly from the accountant's standpoint, as they were preparing or reconciling books, having somebody, a bookkeeper, go in on an occasional basis at a cost of, I guess it was $200 or $300 per visit, they were simply reconciling books. There was no aspect of this that appeared to them that required them to make any representation. About the aiding and abetting violations, so the district court said that aiding and abetting claims require the existence of a primary violation, and that there wasn't a primary violation here. But isn't it right that Pennington argued that the primary violation was Wittig's conduct, and that Mr. Polito aided and abetted Wittig? I think, while I understand Your Honor's question, I believe that what would be required for that is actual knowledge of the violation on the part of the aider and abetter and substantial assistance. Here, the knowledge requirement just can't be satisfied at best. What you have is constructive knowledge, and the aider and abetter has to have actual knowledge of the breach of fiduciary duty. Any of the red flags that are being suggested... I know that you would disagree with this on the fact, but wouldn't it be possible to say that the failure to account for the loan was just so startling that one must infer that the accountant was aiding and abetting Wittig? Isn't that a possible inference? I certainly would disagree. I understand the argument, but in this case, the... I guess my question is, shouldn't the district court at least have addressed that argument as opposed to saying that there wasn't a primary violation? But I believe at best, if the argument is that would have raised a red flag, and therefore they must have known. That, at best, only shows constructive knowledge, not the actual knowledge that would be required for aiding and abetting. I understand Your Honor's argument, but I'm concerned about whether or not that actually raises it to the level of the active requirement under aiding and abetting. Okay. Your Honor, I certainly think that there's more to be had here, but we certainly do rest on our briefs and are available for any further questions. But I think that this is one of those very clear cases that you just can't argue after the fact and try to get another bite at the apple. Here, the arguments were made in the underlying court, and on appeal, this is not the place to take another shot at it and give it a try. Thank you so much, Your Honor. Okay, thank you. If there are no further questions from my colleagues, then thank you very much. I'm sorry, I had reserved three minutes, Your Honor. I was about to recognize you. I was just... I'm sorry, Your Honor. So, Mr. McHugh on rebuttal. Go ahead. Look, we're jumping all over the place, so I'll try to keep this very, very simple. Waiver is just not an issue. Proximate cause was argued extensively. The judge was not sufficiently satisfied with how I addressed it, and we're on the de novo. To say it's been waived, that doesn't count. Well, I'm sorry. I don't know. I mean, Rule 56 says that a party needs to support its assertion that a fact is generally disputed by citing to particular parts of materials in the record or showing that the materials the other party cites don't establish the absence of a genuine dispute. I mean, if... In the statement, there is ample evidence in the record to demonstrate Mr. Pennington suffered monetary harm. Do you think that that cites to particular parts of materials in the record? Well, what I would cite to on that proposition is, and this is joint appendix 141 and 142, just three quick points coming from Mr. DiPolito's deposition. He contradicts himself. He acknowledges personal knowledge of the loan. He testified he was told that the loan was personal obligation of WIDC to the lenders. And he first concedes coming to Seisman, that the funds coming to Seisman show Seisman was the borrower, but then he states he didn't learn that Seisman, he claims that Seisman was not the borrower. He didn't learn it until 2015. That doesn't make any sense. This was before the district court, and the documentary evidence before the district court was how this loan was treated in the aftermath. There was a continuing pattern. I want to take a break and just on a related note here. With regard to aiding and abetting, that's aiding and abetting different causes of action having to do with WIDC. Malpractice has nothing to do with WIDC. Okay. I guess just on your first point, I understand that you were pointing now to particular materials in the record. I mean, is there a key part in your briefing before the district court or argument where you pointed the district court to those specific materials in the record? Well, one aspect before the lower court that I would bring to this court's attention, which I think is important, there was an indication or at least a mention of the arbitration proceeding. Judge Seibel dedicates an entire section to that. It's irrelevant. Footnote 8 at my briefing below sets forth why, and it's never addressed. Clearly, it appears that Judge Seibel found some dicta favorable to defendants, which shouldn't have been considered. The other thing I heard from opposing counsel was that $5 million was left, but the asset was whatever. It was more than enough money. It was a $10 million loan.  In terms of proximate cause being a substantial cause, this is citing from Williams KFC in the Ingersoll case at the brief at 43, where the facts proven show that there are several possible causes of an injury. The plaintiff was not required to exclude every possible cause of the accident. That, combined with the contradictory testimony of Mr. DiPolito, really, I think, together, makes it a misstep by the lower court taking proximate cause typically tied to an issue of fact and credibility. That's left for the fact finder. I think we have that argument. Mr. McHugh, your time has expired. Thank you very much. Thank you, Mr. McHugh. Thank you. The case is submitted.